**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **ALMA LEE ANN VOGT,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:11-CV-315-BH** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION** | § | |
| **Defendant.** | § | |

**MEMORANDUM OPINION AND ORDER**

Pursuant to the consent of the parties and the order of transfer dated July 6, 2011, this case has been transferred for the conduct of all further proceedings and the entry of judgment.  Before the Court are *Plaintiff's Motion for Summary Judgment*, filed July 14, 2011 (doc. 14), and *Defendant's Motion for Summary Judgment*, filed August 15, 2011 (doc. 16).  Based on the relevant filings, evidence, and applicable law, Plaintiff's motion is **DENIED**, Defendant's motion is **GRANTED,** and the final decision of the Commissioner is wholly **AFFIRMED**.

**I.  BACKGROUND**[1]

**A.  Procedural History**

Alma Lee Ann Vogt ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claims for disability benefits under Title II of the Social Security Act.  (R. at 18.)  Plaintiff applied for disability insurance benefits on September 26, 2008, alleging disability beginning May 15, 2008, due to degenerative disk disease and chronic back pain.  (R. at 139-41, 164.)  Her claims were denied initially and upon

---

[1]  The background information comes from the transcript of the administrative proceedings, which is designated as "R."

reconsideration.  (R. at 9, 18, 59-62, 64.)  On March 12, 2009, Plaintiff timely requested a hearing

before an Administrative Law Judge ("ALJ"), and personally appeared and testified at a hearing held

on January 20, 2010.  (R. at 67-68, 28-54.)  On February 12, 2010, the ALJ issued a decision finding

Plaintiff not disabled.  (R. at 9-18.)  Plaintiff appealed, and the Appeals Council denied her request

for review, making the ALJ's decision the final decision of the Commissioner.  (R. at 23, 1-5.)

Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant

to 42 U.S.C. § 405(g).  (*See* doc. 1.)

**B.  Factual History**

**1.  Age, Education, and Work Experience**

Plaintiff was born in 1967.  (R. at 32.)  She completed the 11th grade, obtained her GED, and

has past relevant work experience as a nurse's aide and cashier checker.  (R. at 33.)

**2.  Medical Evidence**

On July 23, 2007, Plaintiff complained to Jeffrey Gilbertson, D.O., of pain in her left upper

chest, left neck, and left shoulder that had started one day earlier.  (R. at 461.)  She was taking

Lortab for ongoing back pain, but it had not helped with her chest and neck pain.  (*Id.*)  Her

examination revealed paravertebral pain at T4 through T6 in the thoracic spine, weakness graded

at 4/5 throughout the biceps and triceps, and large dorsal kyphosis and scoliosis.  (*Id.*)  Dr.

Gilbertson prescribed Lortab, Flexeril, and Celebrex.  (*Id.*)

At a follow-up appointment with Dr. Gilbertson on August 23, 2007, Plaintiff reported some

improvement but still some pain.  (R. at 463.)  Her examination revealed paravertebral pain at L4-

L5, 4/5 throughout flexion at the hip, extension at the knees, flexion at the knee, plantarflexion,

dorsiflexion bilaterally symmetric, straight leg raising positive at 90 degree radiation to the ankle.

(*Id.*)  Dr. Gilbertson noted that Plaintiff had lumbar pain, did not have thoracic pain, had some radiculopathy, and that her pain appeared to have stabilized.  (R. at 463-64.)  Plaintiff requested an Albuterol inhaler due to shortness of breath, and Dr. Gilbertson advised her that she needed better nutrition.  (*Id.*)

On October 4, 2007, Plaintiff reported to Dr. Gilbertson that her pain was not bad as long as she had her pain medication.  (R. at  465.)  Her examination revealed paravertebral pain at L3-5 bilaterally and in the midline strength and normal straight leg raising on the left and right leg.  (*Id.*) Dr. Gilbertson noted that Plaintiff's pain was about the same as before.  (*Id.*)

On February 26, 2008, Dr. Gilbertson's examination revealed paravertebral pain at L3-5 and "straight leg positive on the left for left paravertebral pain."  (R. at 473.)  He noted that she was still experiencing low back pain.  (*Id.*)

On May 9, 2008, Plaintiff complained of an exacerbation of her lower back pain that began a month earlier and denied that she had injured that area.  (R. at  475.)  She stated that the neuropathy in her feet was very bad, Lortab did not help ease her pain, and she was not sleeping much because of the pain.  (*Id.*)  Dr. Gilbertson's examination revealed paravertebral pain of the lumbar spine at L1-2 and L4-5, weakness graded at 4/5 throughout flexion at the hip, extension at the knees, flexion at the knee, plantarflexion, dorsiflexion bilaterally symmetric, and positive straight leg raising on the left leg and negative on the right.  (*Id.*)  He diagnosed Plaintiff with low back pain and prescribed Lortab and Neurontin.  (R. at  475-76.)

On May 19, 2008, Plaintiff complained to Dr. Gilbertson of severe lower back pain radiating to her hips.  (R. at  479.)  She believed the pain was causing the migraine headaches that had begun the previous day.  (*Id.*)  She also began having pain down her left arm and in her jaw and was still

3

not sleeping well.  (*Id.*)  She had been taking Lortab and Neurontin with no relief.  (*Id.*)  Dr. Gilbertson's examination revealed paraverebral pain of the lumbar spine at L1-5, positive bilateral straight leg raising at 30 degrees, and severe redicular pain on the right.  (*Id.*)  He noted that Plaintiff had a history of osteomyelitis and ordered X-rays.  (*Id.*)   X-rays of the lumbar spine showed disc space narrowing at L5-S1.  (R. at  264.)

On May 22, 2008, E. Wayne Johnson, D.O., performed an MRI scan of Plaintiff's lumbar region, revealing normal vertebral height and alignment, no focal disc protrusions or stenosis, L5-S1 disc space narrowing, and disc dehydration consistent with degenerative disc disease.  (R. at 263.)

On May 28, 2008, Dr. Gilbertson reported that Plaintiff had recently been hospitalized for severe back pain, her pain had improved, but she still had pain and symptoms of weakness and leg swelling.  (R. at 477.)  Her examination revealed pain with palpation at the midline of the spinous process and at L4, and positive straight leg raising at 80 degrees bilaterally.  (*Id.*)  Dr. Gilbertson diagnosed her with low back pain.  (R. at 477-78.)  Plaintiff weighed 232 pounds at that visit.  (*Id.*)

On June 9, 2008, Dr. Gilbertson's examination revealed no thoracic paravertebral pain, no midline (spinous process pain), but lumbar paravertebral pain at L4-5, severe midline pain at L4-5, and straight leg raising positive bilateral at 60 degrees.  (R. at 481.)  He noted that Plaintiff continued to have pain radiating down to her feet in the L4-5 distribution.  (R. at 482.)  He diagnosed possible osteomyelitis of the spine and referred her to another doctor to assess the lumbar pain and possible osteomyelitis.  (*Id.*)

On June 16, 2008, Dr. Gilbertson saw Plaintiff after she was hospitalized due to severe lower back pain.  (R. at  483.)  His examination revealed no paraverebral pain of the lumbar, no midline pain, and straight leg raising positive on the left at 90 degrees and negative on the right.  (*Id.*)  Dr.

4

Gilbertson opined that Plaintiff was doing much better and reported that she was able to use less Norco. (*Id.*)  He diagnosed her with low back pain and radiculopathy, prescribed her Neurontin, Lortab, and Norco, and referred her to a neurosurgeon.  (R. at 483-84.)

On July 10, 2008, Plaintiff informed Dr. Gilbertson that the neurosurgeon, Dr. Maxwell, had told her that her muscles primarily caused her pain and that she should have injections in her hips every one and a half weeks.  (R. at 485.)  Dr. Gilbertson's examination revealed that there was paravertebral pain located at L5-S1 and positive straight leg raising at 90 degrees bilaterally. (*Id.*)

On July 24, 2008, Plaintiff reported to Dr. Gilbertson that she felt bad, her back was hurting "very badly", and she had edema in her hands and feet.  (R. at 486-87.)  Examination revealed weakness throughout the biceps, triceps, deltoids, wrists, and in grip strength, as well as weakness involving the hip, extension at the knee, flexion at the knee, plantarflexion, and dorsiflexion bilaterally.  (R. at 487.)  Dr. Gilbertson prescribed her Fentanyl, Neurontin, and Norco.  (R. at 488.)

On August 21, 2008, Plaintiff reported to Dr. Gilbertson that her back was about the same and that she was taking between one and five Norcos daily depending on the amount of pain.  (R. at 492.)  She also stated that she was swimming almost every day. (*Id.*)  Dr. Gilbertson noted that Plaintiff's lower back pain continued to worsen and she needed rehabilitation. (*Id.*)

On September 22, 2008, Plaintiff reported to Dr. Gilbertson that she had been having severe back pain since the previous morning, was experiencing tightness in her back and difficulty walking, and was unable to bend over.  (R. at 510.)  Dr. Gilbertson noted severe bilateral paravertebral pain at L3-5, no midline pain, and positive straight leg raising bilaterally. (*Id.*)  He diagnosed low back pain and lumbosacral radiculopathy and stated that he would continue his attempts to get her into rehabilitation. (*Id.*)

On November 21, 2008, Plaintiff advised Dr. Gilbertson that her back had been hurting more over the preceding three weeks and that she had been unable to find suitable rehabilitation that was covered by her insurance.  (R. at 506.)

On December 29, 2008, during an examination by David A. Ray, D.O., Plaintiff complained of low back pain that began in 2003 and occasionally radiated to her legs.  (R. at 515.)  Her pain prevented her from doing household chores or yard work.  (*Id.*)  She was able to drive but had pain while driving in certain positions and did not drive often because her medication could make her drowsy.  (*Id.*)  She had difficulty putting on shoes and sometimes needed help getting in and out of the bath tub.  (*Id.*)  She also reported that she had fallen several times when her left knee gave way, and sometimes used a walker for ambulation.  (*Id.*)  She leaned on a shopping cart when shopping (*id.*) and could not squat or hop (R. at 517).

Dr. Ray's examination of Plaintiff's back revealed forward flexion to 55 degrees and positive straight leg raising at 20 degrees bilaterally with induced hip pain on the left.  (R. at 516.)  He noted that she had a full range of motion in her extremities, no tenderness in her back to palpation, and no spasm or atrophy.  (*Id.*)  He observed that she could sit, stand, and move about without assistance; walked without a limp but was slightly "stopped" when ambulating; picked up a pen and wrote in a legible manner without difficulty; walked heel to toe without loss of balance; and picked up a 14 pound office stool and moved it across the room with reported mid-back pain.  (R. at 517.)  He diagnosed her with degenerative arthritis of the thoracic spine.  (*Id.*)

On January 15, 2009, John Durfor, M.D. prepared a physical residual functional capacity ("RFC") assessment.  (R. at 519-26.)  After examining Plaintiff's medical evidence, he found that she could perform work with the following limitations: occasionally lift and/or carry 20 pounds;

frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) about 6 hours in an 8 hour workday; sit (with normal breaks) about 6 hours in an 8 hour workday; and unlimited push and/or pull, other than as shown for lift and/or carry.  (R. at 520.)  He also included the following postural limitations: occasional climbing, balancing, stooping, kneeling, crouching, and crawling and no climbing of ladders, ropes, or scaffolds.  (R. at 521.)

On April 13, 2009, Dr. Gilbertson completed a Multiple Impairment Questionnaire in which he diagnosed Plaintiff with degenerative disc disease of the lumbar spine.  (R. at 529-36.)  He noted that Plaintiff's primary complaint was pain radiating down to the back of her legs, and that she had positive straight leg raising with pain radiating down the right leg and left leg to the ankle with S1 distribution.  (R. at 529-30.)  He noted that his diagnosis was supported by an MRI demonstrating disc degeneration at L5-S1.  (R. at 529.)  He rated her pain and fatigue as a moderate 5 on a 10-point scale (R. at 531), noting that her pain, fatigue, and other symptoms "frequently" interfered with her attention and concentration and that she could not tolerate daily activities without high doses of pain medications.  (R. at 534.)  He opined that the limitations precluding her from performing work on a sustained basis included no pushing, pulling, kneeling, bending, stooping, or sitting for prolonged periods.  (R. at 535.)  He did not assess Plaintiff's ability to sit, stand, walk, lift, or carry.  (R. at 531-33.)  He concluded that Plaintiff was unable to work and that she would be absent from work more than three times a month on average.  (R. at 534-35.)

On May 21, 2009, Plaintiff reported continued low back pain to Dr. Gilbertson .  (R. at 228.) She stated that she had started hydrotherapy, but had to stay at the hospital with an ill aunt and was trying to reschedule the therapy.  (*Id.*)  Dr. Gilbertson prescribed Norco and advised her to continue therapy.  (R. at 229.)

On June 22, 2009, Plaintiff reported increased pain and leg cramps at night to Dr. Gilbertson. (R. at 230.) Her examination revealed positive straight leg raising at 100 degrees bilaterally. (*Id*.) Dr. Gilbertson prescribed her Fentanyl. (R. at 231.)

On August 5, 2009, Plaintiff told Dr. Gilbertson that she was doing well but had continued back pain. (R. at 232.) Her examination revealed paravertebral pain at L4-5 with no midline pain and positive straight leg raising at 80 degrees bilaterally. (*Id*.)

On September 17, 2009, Plaintiff complained of ongoing back pain, new neck pain, difficulty sleeping at night, and depression. (R. at 537.) Dr. Gilbertson's exam demonstrated paravertebral pain at L3-5 with no midline pain. (*Id*.)

On December 10, 2009, Plaintiff complained that her lower back hurt all the time. (R. at 234.) An examination by Dr. Gilbertson revealed paravertebral back pain at L3-5 and positive straight leg raising bilaterally at 100 degrees. (*Id*.) Dr. Gilbertson noted that Plaintiff was unwilling to do water aerobics. (*Id*.) He also noted that Plaintiff wanted to increase her duragesic patch even though she admitted her straight leg raise was better. (*Id*.)

In a report dated January 15, 2010, Dr. Gilbertson reported that he was treating Plaintiff for lumbar back pain diagnosed as degenerative joint disease. (R. at 550.) He noted that both x-ray and MRI findings confirmed the degeneration of the lumbar back. (*Id*.) He also noted that he had prescribed medications and had advised Plaintiff to quit smoking, attend water therapy, and follow a strict diet. (*Id*.) He opined that Plaintiff could not sit for long periods of time; perform "any kind of lifting"; do any job that required either prolonged sitting or prolonged standing; and that he believed her disability was expected to persist beyond twelve months unless she was able to change many of her habits. (R. at 550-51.)

8

On February 8, 2010, Plaintiff was evaluated and began receiving treatment for low back pain from Sanjoy Sundaresan, M.D. (R. at 558-84.) Dr. Sundaresan diagnosed Plaintiff with lumbar facet syndrome, lumbar radiculitis, and displaced lumbar disc, and he prescribed Hydrocodone and Fentanyl for pain management. (R. at 562.) He noted that an MRI scan taken on March 11, 2010, showed no significant interval changes since the 2008 MRI scan. (R. at 554.) Between February 8, 2010 through August 6, 2010, he noted that Plaintiff moved all 4 extremities well; had 5/5 motor strength throughout her extremities; had no joint swelling or muscle atrophy; and had a normal gait with no abnormal movements. (R. at 557, 560-61, 581.)

### 3. Hearing Testimony

On January 20, 2010, Plaintiff and a vocational expert ("VE") testified at a hearing before the ALJ. (R. at 28-53.) Plaintiff was represented by a non-attorney representative. (R. at 30.)

#### a. *Plaintiff's Testimony*

Plaintiff testified that she was 43 years old, dropped out of high school in the eleventh grade, and had a GED. (R. at 32-33.) She was married and lived with her husband, her 16-year-old son, and an 18-year-old friend of the family. (R. at 33-36.) She stopped working in May 2008 because of increased back pain. (R. at 37.) Her pain was as severe as a 10 on a 10-point pain scale if she stood for even 10 minutes. (R. at 47-48.) She had attended several types of physical therapy several times without any significant improvement. (*Id*.)

On an average day, Plaintiff got up around 9:00 or 9:30 a.m., took care of her personal hygiene, and dressed herself. (R. at 38, 40.) She took pain medication by mouth and also used a Fentanyl patch for her pain. (R. at 40.) She was unable to do laundry because she could not bend over, but she would fold laundry while sitting in her recliner. (R. at 40-41.) She spent most of her

days sitting in a recliner with her feet up watching TV or reading, but she frequently needed to get up and move around due to her back pain. (R. at 42-43.) She liked to create scrapbooks by cutting out pictures that she had taken of her family. (*Id.*) She left her home a couple times a week (R. at 44) and used a wheel chair or a motorized power cart to get around when she went out with her family (R. at 42).

Plaintiff estimated that she could lift 10 pounds, but only once or twice a day. (R. at 46.) She could stand for about 5 minutes before she had terrible pain and she could sit for about 30 to 45 minutes before she had severe pain. (R. at 48.) When asked what Dr. Gilbertson meant in his RFC about the "habits" Plaintiff would need to change in order to be able to work, Plaintiff indicated that he wanted her to quit smoking and lose weight. (R. at 49.) She stated that she had been successful in losing weight through diet and was down to 210 pounds from 270 pounds. (*Id.*)

### b. *Vocational Expert Testimony*

Clifton King, Jr., a vocational expert ("VE"), also testified at the hearing. (R. at 49-54.) He characterized Plaintiff's prior job as a nurse aide as medium in exertion and semi-skilled. (R. at 51.) He noted that Plaintiff held another job as a cashier that was light in exertion but that it would not meet the duration requirement because the employment was for less than a month. (R. at 50-51.) The ALJ asked the VE to opine whether a hypothetical person of Plaintiff's age, education, and work experience could perform work with the following limitations: occasionally lift and carry objects no more than 20 pounds; frequently lift or carry objects up to 10 pounds; stand and/or walk with normal breaks for 6 hours in an 8 hour work day; sit with normal breaks for a total of 6 hours in an 8 hour work day; postural limitations of occasionally climbing, balancing, kneeling, crouching, crawling, and stooping; no use of ladders, ropes, or scaffolds; and mild to moderate level of fatigue

10

and discomfort affecting her ability to work in a competitive environment.  (R. at 51-52.)  The VE opined that the hypothetical person could not perform Plaintiff's past relevant work, but could perform light unskilled work existing in significant numbers in the local and national economy such as a cashier II, cafeteria attendant, and small parts assembler II.  (R. at 52-53.)  The VE also opined that the hypothetical person could perform sedentary unskilled work such as a food and beverage order clerk, call out operator, and laminator I.  (R. at 53.)

Plaintiff's representative asked the VE to assume that the person in the ALJ's hypothetical had the following additional limitations: rarely able to lift and carry 10 pounds, could stand no more than 10 minutes at a time before she needed to sit down, needed to sit down most of the day, and needed to recline to elevate feet off and on to reduce swelling for 30 minutes at a time, 2 or 3 times a day.  (R. at 53-54.)  The VE testified that the individual with the additional limitations would not be able to maintain work without significant accommodation. (R. at 54.)

## C. ALJ's Findings

The ALJ denied Plaintiff's application for benefits by written opinion issued on February 12, 2010.  (R. at 18.)   At step 1, the ALJ determined that Plaintiff met the insured status requirements through March 31, 2013, and had not engaged in substantial gainful activity since May 15, 2008, the alleged onset date.  (R. at 11.)  At step 2, he found that Plaintiff suffered from the severe impairment of degenerative disc disease of the lumbar.  (*Id.*)  At step 3, he determined that Plaintiff had no impairment, or combination of impairments, that met or equaled the requirements of any listed impairment in the regulations for presumptive disability.  (R. at 11.)  He also found that Plaintiff's subjective complaints were not fully credible.  (R. at 13.)  He next determined that Plaintiff retained the RFC to perform a limited range of light work.  (R. at 12.)  He found that she

could lift or carry 20 pounds occasionally and 10 pounds frequently; walk and stand 6 hours out of

an 8-hour workday; occasionally climb ramps and stairs; and occasionally balance, stoop, kneel,

crouch, and crawl. (*Id*.) He found that she was unable to climb ladders, ropes, or scaffolds. (*Id*.)

At step 4, the ALJ determined that Plaintiff was not able to perform her past relevant work. (R. at

16.)

At step 5, with the assistance of VE testimony, the ALJ found that Plaintiff could perform

other work existing in significant numbers in the national economy. (R. at 17.) Based on VE

testimony, the ALJ found that Plaintiff would be able to perform the requirements of light unskilled

occupations such as cashier II, with 1,500,000 positions in the national economy; cafeteria attendant,

with 500,000 positions in the national economy; small parts assembler, with 200,000 positions in

the national economy; order clerk, with 200,000 jobs in the national economy; call out operator, with

90,000 jobs in the national economy; and laminator I, with 35,000 jobs in the national economy.

(R. at 17-18.) Accordingly, the ALJ found that Plaintiff was not disabled at any time through the

date of the decision. (R. at 18.)

## II. ANALYSIS

### A. **Legal Standards**

#### 1. **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Com-

missioner's position is supported by substantial evidence and whether the Commissioner applied

proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir.

1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a

reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but

it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).   In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.   A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985).   Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*.   Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*. at 436 & n.1.

### 2.  Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64.   The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A).   When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295.   An "impairment which had its onset or became disabling after the special

13

earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at Step Five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner

14

fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### 3. Standard for Finding of Entitlement to Benefits

Plaintiff asks the Court to reverse the Commissioner's decision and remand the case solely for calculation and award of benefits. (*See* Pl. Br. at 19.) When an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make an award if the record enables the court to determine definitively that the claimant is entitled to benefits." *Armstrong v. Astrue*, 2009 WL 3029772, at * 10 (N.D. Tex. Sept. 22, 2009). The claimant must carry "the very high burden of establishing 'disability without any doubt.'" *Id.* at * 11 (citation omitted). Inconsistencies and unresolved issues in the record preclude an immediate award of benefits. *Wells v. Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005). The Commissioner, not the court, resolves evidentiary conflicts. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

## B.  Issues for Review

Plaintiff raises the following issues for review:

1. Whether the ALJ failed to follow the treating physician rule;

2. Whether the ALJ erred by not considering Plaintiff's obesity;

3. Whether the ALJ failed to properly evaluate Plaintiff's credibility; and

4. Whether the ALJ relied upon flawed vocational expert testimony.

(Pl. Br. at 2.)

**C.  Issue 1: Treating Physician Rule**

Plaintiff contends that the ALJ failed to give controlling weight to the treating source opinion of Dr. Gilbertson without articulating his reasons in accordance with the criteria set forth in 20 C.F.R. § 404.1527(d).  (Pl. Br. at 8-14.)  She complains that the ALJ gave his opinion "little weight" while assigning "great weight" to the opinions of non-examining state agency medical consultants, and failed to provide good reasons for rejecting it entirely.  (*Id.* at 9-11.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence.  20 C.F.R. § 404.1527(c)(2).  Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source.  20 C.F.R. § 404.1527(d).  A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has, or has had, an ongoing treatment relationship with the claimant.  20 C.F.R. § 404.1502.  When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight.  20 C.F.R. § 404.1527(d).  If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion:  (1) whether the source examined the claimant; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion."  *See id.* § 404.1527(d)(1)-(6).

16

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 455-56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

Prior to his April 2009 disability statement in which he first opines that Plaintiff is unable to work, Dr. Gilbertson consistently found that Plaintiff had normal left straight-leg-raising; bilateral symmetry in the right leg; negative results for acute neurological changes; negative results for the musculoskeletal system; an active range of motion with symmetry of strength in all extremities; no cyanosis, clubbing, parathesia, or edema of the extremities; no para-vertebral pain in the lumbar region; no paralysis or weakness; no motor loss in the back area; and a nuclear bone scan that showed normal results for the lumbar spine. (R. at 239, 277, 280-81, 290, 332-33, 383, 475, 477,

490, 506.)  This evidence contradicts Dr. Gilbertson's April 2009 and January 2010 opinions that Plaintiff was unable to work.  Because his opinions were unsupported by the evidence, the ALJ was free to give Dr. Gilbertson's opinion little or no weight.  *See Newton*, 209 F.3d at 455.

Evidence from other physicians, including examining physicians, also contradicted Dr. Gilbertson's disability opinion.  On May 22, 2008, Dr. Johnson, a treating physician, performed an MRI scan of the lumbar region that revealed normal vertebral height and alignment and negative results for focal disc protrusions or stenosis.  (R. at 263.)  On December 29, 2008, Dr. Ray, an examining physician, noted that Plaintiff walked without a limp; sat; stood; and moved around without assistance; was able to heel and toe walk without a loss of balance; had no tenderness to palpation in the back area, spasms, or atrophy; and lifted a 14 pound office stool and carried it across the room with reported mid-back pain.  (R. at 516-17.)  On January 15, 2009, after examining Plaintiff's medical evidence, Dr. Durfor found that Plaintiff would be able to work with the following limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) about 6 hours in an 8 hour workday; sit (with normal breaks) about 6 hours in an 8 hour workday; unlimited push and/or pull, other than as shown for lift and/or carry.  (R. at 520.)  He also included the following postural limitations: occasionally climbing, balancing, stooping, kneeling, crouching, and crawling and no climbing of ladders, ropes, or scaffolds.  (R. at 521.)  The ALJ was free to reject Dr. Gilbertson's disability statements because the evidence supported a contrary opinion.  *See Newton*, 209 F.3d at 455.  Moreover, it was proper for the ALJ to give great weight to the well supported non-examining state physicians' opinions that Plaintiff could perform light work because an ALJ may accept a better supported non-examining physician's opinion over the opinion of a treating physician.  *See Oldham v. Schweiker*, 660 F.2d

18

1078, 1084 (5th Cir. 1981); (R. at 15, 499-503, 519-526.)

Finally, in both his April 2009 and January 2010 statements, Dr. Gilbertson opined that Plaintiff was "disabled" and unable to work due to sitting, standing, and walking limitations.  (R. at 531, 534, 551).  Section 404.1527(d) does not apply to opinions that a claimant cannot work or is disabled.    *See Walker v. Barnhart*, No. 04-31256, 158 F.App'x (5th Cir. Dec. 9, 2005).  Moreover, a treating physician's opinions regarding a Plaintiff's disability are legal conclusions and have no special significance.  20 C.F.R. § 416.927(e); *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003).  Because physicians generally define "disability" in a manner distinct from the Act, an ALJ can properly reject any conclusion of disability as determinative on the ultimate issue.  *See Tamez v. Sullivan*, 888 F.2d 334, 336, n.1 (5th Cir. 1989) (doctor's note that claimant was "disabled" did not mean that the claimant was disabled for purposes of the Act).

The ALJ's decision to give little weight to Dr. Gilbertson's opinions was not erroneous and is supported by substantial evidence in the record.  Remand is therefore not required on this issue.

## D.  Issue 2: Obesity

Plaintiff argues that the ALJ failed to properly consider her obesity because he did not analyze its impact on her functional limitations or on her degenerative lumbar spine condition "despite the clear implications of her obesity on her spinal degenerative disc disease."  (Pl. Br. at 14.)  She contends that her Body Mass Index (BMI) was "near or above 40" during the relevant period at issue, which would put her in the most extreme level of obesity.  (*Id.*)

According to Social Security Regulations, obesity itself is not a listed impairment, but it can reduce an individual's occupational base for work activity in combination with other ailments.  *See* SSR 02-1p, 2000 WL 34686281, at *3 (S.S.A. Sep. 12, 2002).  The National Institutes of Health

created parameters, which are relied upon in the Social Security Regulations, for measuring three

levels of obesity based on a BMI. *Id.* at *2. Level I obesity includes BMIs of 30.0 to 34.9; Level

II includes BMIs of 35.0 to 39.9; Level III, also known as "extreme" obesity, includes BMIs greater

than or equal to 40. *Id.* These classifications "describe the extent of the obesity, but they do not

correlate with any specific functional loss." *Id.* Rather than determining a specific functional loss,

obesity is a factor to be considered in the sequential evaluation process. *Id.* at *3. At Steps 4 and

5, the Commissioner considers the effect of obesity on an individual's RFC. *Id.*

Here, the ALJ noted that Plaintiff had been successful at losing weight and had dropped from

270 to 210 pounds but did not explicitly discuss her obesity. (R. at 13.) However, Plaintiff fails to

cite to any evidence in the record to demonstrate that her obesity exacerbated her other medical

impairments. She cites no evidence where her physicians stated that her obesity imposed additional

limitations on her other medically diagnosed impairments. Accordingly, Plaintiff has not met her

burden to show that her obesity impacted her physical and mental ability to sustain work activity,

and this point of error is merely speculative. *See Leggett*, 67 F.3d at 564; SSR 02-1p, 2002 WL

34686281, at *6. Remand is therefore not required on this issue.

### E. Issue 3: Credibility

Plaintiff next contends that the ALJ improperly assessed the credibility of her statements.

regarding the intensity, persistence, and limiting effects of her symptoms, when he inappropriately

found that her daily activities were "inconsistent with disability," and improperly relied on her lack

of a prescription for a wheelchair and her inability to stop smoking to evaluate her credibility. (Pl.'s

Br. at 15-18.)

Credibility determinations by an ALJ are entitled to deference. *See Carrier v. Sullivan*, 944

F.2d 243, 247 (5th Cir. 1991).   The ALJ is in the best position to assess a claimant's credibility since the ALJ "enjoys the benefit of perceiving first-hand the claimant at the hearing." *Falco v. Shalala*, 27 F.3d 164 n.18 (5th Cir. 1994).  SSR 96-7p requires the ALJ to follow a two-step process for evaluating a claimant's subjective complaints.  SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996).   First, the ALJ must consider whether the claimant has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms.  *Id*.  Once such an impairment is shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability to do basic work activities.  *Id*.  If the claimant's statements concerning the intensity, persistence, or limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a credibility finding regarding the claimant's statements.  *Id.*; *Falco*, 27 F.3d at 164 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1985)).

The ALJ's credibility determination must be based on a consideration of the entire record, including medical signs and laboratory findings, and statements by the claimant and his treating or examining sources concerning the alleged symptoms and their effect.  SSR 96-7p, 1996 WL 374186, at *2.  The ALJ must also consider a non-exclusive list of seven relevant factors in assessing the credibility of a claimant's statements: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, for relief of pain or other symptoms; (6) measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back); and (7) any other factors concerning the claimant's functional limitations

21

and restrictions due to pain or other symptoms." *Id.* at *3.  The ALJ's evaluation of the credibility of subjective complaints is entitled to judicial deference if supported by substantial record evidence. *See Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990).

Here, the ALJ found that Plaintiff's lumbar disc disease could reasonably be expected to produce some of her back and leg pain but not to the degree of severity she alleged.  (R. at 14.) It is clear from his decision that he reviewed the evidence before applying several of the credibility factors listed in SSR 96-7p to Plaintiff's case.  (R. at 14-15.)  He relied on Dr. Gilbertson's findings that Plaintiff had normal left straight-leg-raising; bilateral symmetry in the right leg; negative results for acute neurological changes; negative results for the musculoskeletal system; an active range of motion with symmetry of strength in all extremities; no cyanosis, clubbing, parathesia, or edema of the extremities; no para-vertebral pain in the lumbar region; no paralysis or weakness; no motor loss in the back area; and a nuclear bone scan that showed normal results for the lumbar spine.  (R. at 15-16, 239, 277, 280-81, 290, 332-33, 383, 475, 477, 490, 506.)  The ALJ noted that a 2008 MRI scan of the lumbar region showed normal vertebral height and alignment and negative results for focal disc protrusions and stenosis. (R. at 14, 263.)  He also considered Dr. Ray's observations that Plaintiff walked without a limp; sat, stood, and moved around without assistance; was able to heel and toe walk without a loss of balance; had no tenderness to palpation in the back area or spasms or atrophy; and was able to carry a 14-pound stool across the room with some back pain. (R. at 13, 516-517.)  The absence of objective factors indicating the existence of severe pain, such as significant limitations in range of motion, muscular atrophy, weight loss, or impairment of general nutrition justifies the conclusions of the ALJ.  *See Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987)

The ALJ also found, based on the medical evidence of record, that Plaintiff was exaggerating her symptoms.  (R. at 15.)  The ALJ noted that Plaintiff had reported back problems since 2005 but was able to work until 2008, and that there was nothing in the record to substantiate any injury or any objective circumstance that would have worsened her condition.  (R. at 15, 37.)  He also noted that Plaintiff said she experienced excruciating pain of a 10 on a scale from 1 to 10 when she stood for 10 minutes and that she could only sit for 30 to 45 minutes before hurting.  (R. at 15, 47-48.)  He considered evidence that Plaintiff swam on a regular basis even after she stopped working, took care of her own personal hygiene, prepared simple meals, folded laundry, drove, went shopping, used a motorized cart at the store, "latch hook[ed] rugs," did scrapbooking which required extensive sitting, helped her son with homework, and read and watched TV.  (R. at 15, 38-44, 177, 204, 492.)  He further noted that although Plaintiff testified that she was prescribed a wheelchair and a walker, there was no medical evidence to support those claims, and she had failed to check any of the ambulatory assistive devices listed on her disability report, including a wheelchair.  ( R. at 15, 209.)  He also found that her non-compliance with her doctor's prescribed treatment to quit smoking decreased her credibility.  (R. at 15, 49.)

The ALJ's narrative discussion shows that he relied primarily on the medical evidence of record to find Plaintiff not credible.  Although not in a formalistic fashion, he also considered the factors for determining credibility, and relied on substantial evidence to support his credibility assessment.  Remand is therefore not required on this issue.

## F.  Issue 4: Flawed Vocational Expert Testimony

Plaintiff argues that the ALJ relied on flawed VE testimony in making her disability determination because the testimony was produced in response to an improper hypothetical question

23

that did not include all of her limitations borne out by the record.  (Pl. Br. at 18-19.)  She specifically contends that the VE's testimony does not constitute the substantial evidence needed to meet the Commissioner's burden of proof at step 5 because it improperly relied upon the opinions of the non-examining sources and failed to adequately consider the findings of Dr. Gilbertson.  (*Id*. at 19.)

To establish that work exists for a claimant at steps four and five of the sequential disability determination process, the ALJ relies on the medical-vocational guidelines or the testimony of a VE in response to a hypothetical question.  *See Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).  A hypothetical question posed by an ALJ to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question.  *Id*. at 436.  A claimant's failure to point out deficiencies in a hypothetical question does not "automatically salvage that hypothetical as a proper basis for a determination of non-disability."  *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001).  If the ALJ relies on testimony elicited by a defective hypothetical question in making a disability determination, the Commissioner does not carry his burden of proof to show that a claimant could perform available work despite an impairment.  *Id*. at 708.

Here, the ALJ presented a hypothetical question to the VE asking whether work existed for an individual with Plaintiff's age, education, and work experience who could occasionally lift and carry objects no more than 20 pounds and frequently lift or carry objects up to 10 pounds, stand and/or walk with normal breaks for 6 hours in an eight hour work day, and sit with normal breaks for a total of 6 hours in an 8 hour work day.  (R. at 51-52.)  The ALJ also included postural limitations for occasional climbing, balancing, kneeling, crouching, crawling, and stooping and no use of ladders, ropes, or scaffolds.  (R. at 52.)  Finally, the ALJ noted that the hypothetical individual

experienced mild to moderate level of fatigue and discomfort affecting her ability to work in a competitive environment.  (R. at 51-52.)  This hypothetical question properly incorporated all of Plaintiff's limitations supported by the record and recognized by the ALJ.  *See Masterson v. Barnhart,* 309 F.3d 267, 273 (5th Cir. 2002) (upholding ALJ's hypothetical question when it scrupulously incorporated all of the claimant's disabilities supported by evidence and recognized by the ALJ).  Substantial evidence therefore supports the ALJ's step 5 finding that Plaintiff could perform work that existed in significant numbers in the national economy.  The ALJ also properly rejected the VE's testimony that an individual with the additional limitations listed by Plaintiff's counsel would not be able to perform any work activity.  An ALJ is not bound by VE testimony that is based upon evidentiary assumptions that he ultimately rejects.  *See Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985).  Accordingly, no error occurred and remand is not required on this issue.

## III.  CONCLUSION

Plaintiff's motion for summary judgment is **DENIED**, Defendant's motion for summary judgment is **GRANTED**, and the final decision of the Commissioner is wholly **AFFIRMED**.

**SO ORDERED,** on this 2nd day of November, 2011.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE